UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 18-cr-00331 |
| VERSUS | CHIEF JUDGE HICKS |
| LEQUINTON JERRY and OMAR WILLIAMS | MAGISTRATE JUDGE HORNSBY |

**REPORT AND RECOMMENDATION**

**Introduction**

Defendants Lequinton Jerry ("Jerry") and Omar Williams ("Williams") are each charged with one count of felon in possession of a firearm. The charges arose as a result of a traffic stop in Bossier City, Louisiana. Before the court are **Defendants' Motions to Suppress. Docs. 19 & 31**. Defendants argue that the police lacked sufficient cause to stop the car or to search it. For the reasons that follow, it is recommend that Defendants' motions to suppress be denied.

**Background Facts**

Just before midnight on June 7, 2018, Lt. Dave Faulk and Det. Tim Wooten of the Bossier Parish Sheriff's Office patrolled the area near the intersection of Benton Road and Interstate 220 in Bossier City. Doc. 37, Tr. 8–9. Lt. Faulk was driving a marked police car on Benton road north of I-220, and Det. Wooten was driving an unmarked police car just south of I-220. Tr. at 9–10, 55. Neither of the officers' cars were equipped with video or audio recorders.

Lt. Faulk and Det. Wooten were assigned to this location based on approximately twenty reported car burglaries and thefts by area gang members that had occurred in the nearby Green Acres Place neighborhood during the late-night hours of the preceding weeks. Tr. 8–9, 51–53. In fact, the Bossier Parish Sheriff's Office had received a report of a car burglary within a week of this patrol assignment. Tr. 52. Lt. Faulk and Det. Wooten were told that the burglary suspects were young African-American gang members, with ages ranging from 15 to 21, coming from Shreveport late at night in groups of two or more per vehicle. Tr. 9.

Lt. Faulk and Det. Wooten collaborated during the patrol assignment by communicating via radio when the officers observed a car that either matched the description of the suspects or whose driver committed a traffic infraction. Tr. 9–10, 54–55. Lt. Faulk testified that he only stopped cars that first committed traffic infractions. Tr. 11.

At approximately 11:30 p.m., Lt. Faulk observed a Green Mercury Marquis traveling north on Benton Road. Tr. 12. Lt. Faulk followed the car for about one mile beginning in the vicinity of the car dealerships just north of I-220. Tr. 26. He saw the car "touch[] the centerline on Benton Road going northbound, and then a few moments later it touched the fog line." Id. He then observed the car weave within its lane "at least one more time . . . touching the centerline and fog line, and that's when I went ahead and initiated the traffic stop." Id.

Lt. Faulk recognized this conduct to be improper lane usage in violation of Louisiana Revised Statute 32:79. Tr. 12, 41. Lt. Faulk also testified that the weaving could

be indicative of intoxicated driving based on his experience. Tr. 6–7, 22. He stopped the car at the Dixie Mart gas station on Benton Road and submitted the car's plate number via radio dispatch. Tr. 13.

As Lt. Faulk reported the car's license plate number via radio dispatch, he observed that two people were occupying the car, and they were "doing a bunch of erratic movement in the car," including "leaning and moving . . . in ways normal people don't do." Tr. 14. The two occupants were leaning so far forward that Lt. Faulk "could not see their shoulders . . . just a little top of a head." Tr. 15.

Det. Wooten arrived at the traffic stop "within a few seconds" to a minute of the initial stop. Tr. 15, 58. Det. Wooten recalled that Lt. Faulk "already had his lights initiated and they were pulling into the gas station as I was driving up." Tr. 74–75. Det. Wooten also observed that both occupants were "bent over," and "were grabbing for something under the seat," which he thought was "a pretty big safety risk for a traffic officer on scene." Tr. 58-59. In Det. Wooten's experience, "they're trying to hide guns or dope or drugs." Tr. 59. Det. Wooten ordered the occupants to show their hands "due to it being a safety risk for both of us." Tr. 59.

Lt. Faulk approached the driver's window and asked both occupants for their identification. Tr. 15–16. He identified the driver as defendant Williams and the front passenger as defendant Jerry. Meanwhile, Det. Wooten approached the front passenger side of the car and spoke with Jerry. Tr. 15, 59. Det. Wooten noted that Williams and Jerry appeared to be "nervous and scared," and their demeanor was "frightened, shaking, and nervous." Tr. 61.

Within "a couple seconds" of seeing Williams and Jerry's reaching motions, Det. Wooten testified that he opened Jerry's passenger door because "normally when someone's reaching under the car [seat], like I said, they're hiding something, and everything happens pretty fluid. I'm wanting to get him out of the car to secure him for my safety and his safety; so ultimately, I've got to open the door to do that." Tr. at 61-62. As Det. Wooten opened Jerry's door, he "immediately noticed the plastic baggie hanging out of [Jerry's] right pant leg." Tr. 62. Det. Wooten noted that a "good bit of the bag" was "hanging out of Jerry's pocket." Tr. 63. Based on his training and experience in narcotics investigations, Det. Wooten believed the type of bag to be indicative of those "commonly used to store narcotics." Id.

Det. Wooten recalled that he asked Jerry if he "minded handing me the bag so I could see what was in it." Tr. 64. Det. Wooten recalled phrasing this question according to his common practice in such scenarios, which is to ask in the form of a question. Det. Wooten took the bag and observed that it contained apparent marijuana. Id.

As Det. Wooten placed the bag of marijuana on the roof of the car, Lt. Faulk observed Jerry slowly reaching again under his seat. Tr. 16, 64. The officers then ordered both occupants of the car, at gunpoint, to show their hands. Tr. 16. Det. Wooten then pulled Jerry out of the car. Tr. 16, 64–65. As Det. Wooten attempted to handcuff Jerry, Jerry attempted to flee on foot. Tr. 17, 65. Det. Wooten struggled with Jerry on the ground nearby, and Lt. Faulk helped take Jerry into custody. Tr. 17. He then "patted down" Jerry and found a loaded .40 caliber Glock magazine in Jerry's pocket. Tr. 65. The officers then placed Jerry and Williams in the back of Lt. Faulk's police car. Tr. 18.

The officers searched Williams' car and found a Glock .40 caliber pistol loaded with 24 rounds of ammunition underneath Jerry's seat.  Tr. 19, 65.  The officers then searched the trunk and found a black Pioneer Arms 9x19 caliber pistol loaded with 29 rounds of ammunition.  Tr. 20.

The officers did not know that the defendants were convicted felons at the time of the car search, but they were in the process of obtaining that information.  Tr. 66–68.  Det. Wooten testified that, although they were still waiting to receive the full criminal histories for the defendants during the car search, they would have, as a matter of policy, waited to receive criminal history information before releasing Williams based on the arrest of Jerry and issue of joint possession of the firearm.  Tr. 68.

The car was later released to a family member of Williams.  Tr. 72.  When asked if the car would have been searched "prior to releasing it to a family member in this kind of situation," Det. Wooten replied "Absolutely . . . [t]o ensure that any evidence doesn't get moved or destroyed and that the family member taking possession of the car doesn't get pulled over and charged with something that they weren't – didn't know was in the car."  Tr. 72.

The entire incident from stop to the point that Jerry attempted to flee occurred very quickly.  Tr. 22, 62, 65.  Lt. Faulk estimated that Jerry fled within the first minute of his approach, which is corroborated by Det. Wooten, who estimated that he opened Jerry's door within several seconds of first observing the reaching motions and further estimated that "not thirty or twenty seconds" elapsed from the time he pulled Jerry out of the car and Jerry fled.  Tr. 65.

Williams made a post-Miranda statement to Lt. Faulk, admitting that he knew he was a convicted felon and was not supposed to possess a firearm. Tr. 20. Several weeks later, Williams was also interviewed by ATF Special Agent ("SA") David Moore. Williams again waived his Miranda rights and stated:

> I own the gun that was found in the trunk. I modified it only to put a strap on it. I bought it from a crack head in Cedar Grove several years ago. I know I'm a felon but I just need it for protection. I've let Jerry and others borrow the gun in the past. I shot it once just to make sure it works. I don't own the other gun they found in the car.

SA Moore testified that he obtained the registration of Williams' car and verified that Williams was the registered owner on the date of the incident. Tr. at 79.

Williams testified that he lived at 2931 Stonewall Street in Shreveport. Tr. at 84. Incredibly, he testified that on the night in question both he and Jerry were traveling to the emergency room at Willis Knighton in Bossier City to be checked for sexually transmitted diseases. Tr. at 87. Despite never having been to Willis Knighton in Bossier, Williams testified that he chose the Bossier City hospital over the Willis Knighton-operated emergency room in Shreveport (which is located at 2600 Greenwood Road and which online maps show is located less than a mile from his house).

**Law and Analysis**

In Defendants' motions to suppress, they challenged (1) the basis for the initial stop; and (2) the validity of the search of the vehicle after the traffic stop. Following the hearing on Defendants' motions to suppress, the parties requested and received leave to file supplemental briefs. The only issue addressed in Defendants' supplemental briefs is

whether there was probable cause for the traffic stop. Indeed, Jerry's brief states that this issue is the "only issue." Nevertheless, the court will address both issues.

### A. Traffic Stop

A traffic stop constitutes a seizure under the Fourth Amendment, and its legality is analyzed under the framework set forth in Terry v. Ohio, 392 U.S. 1 (1968). Under Terry, a court determines the reasonableness of a traffic stop by examining "whether the officer's action was: (1) justified at its inception; and (2) reasonably related in scope to the circumstances that justified the interference in the first place. United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005).

Under the first prong, a traffic stop is justified at its inception when an officer has a reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." Id. Reasonable suspicion exists when officer has "a particularized and objective basis for suspecting legal wrongdoing" based on the totality of the circumstances. Id. An officer must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." Id.

"[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of [a stop or] arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." United States v. Zavala, 541 F.3d 562, 575 (5th Cir. 2008). An

officer has probable cause to conduct a traffic stop when he personally observes the defendant commit the traffic violation. United States v. Rosales-Giron, 592 F. App'x 246, 251 (5th Cir. 2014).

The traffic stop was justified at its inception because, once Lt. Faulk observed Williams' car weave and touch the fog line, he had probable cause to believe a traffic violation, specifically a violation of La. R.S. 32:79, had occurred. Williams' contrary testimony is not credible. Therefore, Terry's first prong is clearly met.

Under the second prong of Terry, the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004). "During a traffic stop, a police officer may examine a driver's license and vehicle registration, [and] run a computer check on the driver and the vehicle." Zavala, 541 F.3d at 576. An officer "must ensure that the driver does not have a warrant or a suspended license, and that the vehicle is registered and not reported stolen. These checks are routine and quickly performed." Id. at 577.

An officer "may also ask about the purpose and itinerary of the occupant['s] trip as part of [his] investigation," because these questions are "reasonably related in scope to his investigation of the circumstances that caused the stop." United States v. Pack, 612 F.3d 341, 350 (5th Cir.), opinion modified on denial of reh'g, 622 F.3d 383 (5th Cir. 2010). Additionally, an officer may question the driver on matters unrelated to the purpose of a traffic stop, "so long as these unrelated questions do not extend the duration of the stop." Id.

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) (internal citations omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose." Id. The authority for the seizure "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. Thus, although certain unrelated inquiries that do not lengthen a roadside detention are permissible, a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). "In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed." United States v. Santiago, 310 F.3d 336, 342 (5th Cir. 2002). Reasonable suspicion need not rise to the level of probable cause, but a "mere hunch" will not suffice. Zavala, 541 F.3d at 574.

The officers had ample reasonable suspicion to believe that criminal activity, aside from the original traffic violation, was occurring. Defendants were stopped late at night heading in the direction of a neighborhood that was being targeted by Shreveport gang members for vehicle thefts and burglaries. As Defendants were being stopped, they repeatedly reached under the seat as if to hide drugs or retrieve a gun. In fact, while the officers were asking Defendants for their identification, they appeared excessively nervous and they continued to make furtive movements as if they were hiding or retrieving something from under the seats. This led the officers to order Defendants at gun point to

show their hands, and also led Lt. Faulk to open the car door to get a better view of what Jerry was doing with his hands. At that point, the baggie of marijuana was in plain view hanging out of Jerry's pant pocket. Then, as he was being removed from the car, Jerry attempted to flee on foot. These facts provided the officers with ample reasonable suspicion to continue their detention of Defendants following the traffic stop.

### B. Standing to Challenge the Searches

The Government argues that (a) Williams lacks standing to challenge the search and seizure of Jerry's plastic bag containing marijuana, and (b) Jerry lacks standing to challenge the search of Williams' car. The court agrees. To establish standing for a Fourth Amendment claim, a defendant must show he has a "personal expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" Minnesota v. Carter, 525 U.S. 83, 88 (1998), quoting Rakas v. Illinois, 439 U.S. 128, 143–44, and n. 12 (1978).

The hearing testimony and briefs show that Williams failed to assert a personal expectation of privacy in Jerry's pocket or the marijuana, and Jerry failed to assert a personal expectation of privacy in Williams' car or the firearms. Moreover, Williams had no reasonable expectation of privacy in Jerry's pant pocket because expectations of privacy in another's clothing pockets, even less so than in another's purse or wallet, is not recognized in personal property law or by society. Rawlings v. Kentucky, 448 U.S. 98, 103–04 (1980) (holding the defendant lacked a reasonable expectation of privacy in an acquaintance's purse). Similarly, Jerry had no reasonable expectation of privacy in

Williams' car because a mere passenger's expectation of privacy in another's car is not recognized in personal property law or by society. Rakas, 439 U.S. at 149–50 (holding the defendant lacked a reasonable expectation of privacy in another's car when the defendant was merely a passenger). Therefore, Williams lacks standing to challenge the seizure of Jerry's marijuana that ultimately gave rise to probable cause for the car search, and Jerry lacks standing to challenge the car search because each defendant lacks a legitimate expectation of privacy in the respective places searched.

### C. Opening the Car Door

Opening a car door by police during a traffic stop is a search under the Fourth Amendment and must be reasonable under the circumstances. United States v. Meredith, 480 F.3d 366, 369 (5th Cir. 2007). While Defendants do not appear to separately challenge the opening of the passenger side door by Det. Wooten, the court feels compelled to address the issue.

Under Terry, legitimate officer safety concerns can reasonably outweigh personal liberty interests during street encounters, justifying limited searches for weapons without probable cause. Terry acknowledged the legitimacy of a policeman's interest in taking steps to assure himself that a person with whom he is dealing is not armed and dangerous, and it emphasized this concern by citing the increasing number of murders and assaults being perpetrated on law enforcement officers. Terry, 392 U.S. at 23, n. 21. An officer need not be certain that an individual is armed; the issue is whether a reasonably prudent man could believe, based on "specific and articulable facts," that his safety or that of others

is in danger. Id. at 27. In assessing reasonableness, "due weight" must be given to the facts and inferences viewed "in light of [the officer's] experience." Id.

The Supreme Court has extended this principle to roadside encounters, permitting police to search the passenger compartment of an automobile limited to those areas in which a weapon may be placed or hidden when the officer has reasonable suspicion that the suspect is dangerous and may gain immediate control of weapons. Michigan v. Long, 463 U.S. 1032, 1049–50 (1983). Reasonable suspicion is based on "specific and articulable facts" and the "rational inferences" therefrom. Certainty is not required; rather, the issue is whether a reasonably prudent man could believe that his safety or that of others is in danger. Michelletti, 13 F.3d at 840–41. These facts and inferences are viewed in light of the officer's experience, and "factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." United States v. Ibarra-Sanchez, 199 F.3d 753, 759 (1999).

Lt. Faulk and Det. Wooten had reasonable suspicion to believe Williams and Jerry were dangerous and could gain immediate control of weapons. These suspicions were founded on a myriad of "specific and articulable facts." The defendants were driving late at night at approximately 11:30 p.m. The officers knew the area was experiencing a high crime rate of approximately 20 car burglaries or thefts during the late-night hours of the preceding weeks. The suspected burglars were known to the officers to be affiliated with street gangs, which, as a matter of course, deal in drugs and guns. Tr. 8–9, 51–53. The officers observed Williams swerve along the roadway multiple times. Tr. 12. Upon stopping Williams' car, Lt. Faulk noticed the occupants were "doing a bunch of erratic

movement in the car," including "leaning and moving . . . in ways normal people don't do." Tr. 14. The two occupants were leaning so far forward that Lt. Faulk "could not see their shoulders . . . just a little top of a head." Tr. 15.

Det. Wooten also observed that both occupants were "bent over," and "were grabbing for something under the seat," which he thought was "alarming for a traffic stop." Tr. 58–59. Det. Wooten noted that Williams and Jerry appeared to be "frightened, shaking, and nervous." Tr. 61. Det. Wooten testified that within "a couple seconds" of seeing Williams and Jerry's reaching motions, he opened Jerry's passenger door "to get him out of the car to secure him" out of safety concerns. Tr. 62. Accordingly, the opening of the car door under these circumstances was reasonably related in scope to the articulable facts giving rise to the weapons threat.

This case is similar to Michigan v. Long, 463 U.S. 1032 (1983), in which the Supreme Court held that police had reasonable suspicion to conduct a protective search of the passenger area of a car. There, police stopped the defendant's car based on a traffic infraction late at night. The officers observed the defendant swerve off the road into a shallow ditch. The officers stopped to investigate, and defendant met them at the rear of his car. The defendant did not immediately respond to officers' questions and "appeared to be under the influence of something." The officers observed a large hunting knife through the open door of the car. Officers then searched the defendant's car and found marijuana near the armrest. The Court recounted each of these facts and found they together gave rise to reasonable suspicion that the defendant posed a danger if he were permitted to reenter his car and, therefore, the officers' limited search was justified.

This case is also similar to United States v. Ullrich, 580 F.2d 765 (5th Cir. 1978), in which the Fifth Circuit held that police had reasonable suspicion to search an area of a car believed to conceal a weapon. There, police received a report that the defendant had used a stolen credit card at a mall. The officer stopped the defendant's car in the mall parking lot. Upon the officer asking the defendant for identification, the defendant "procrastinated, then reached for his glove compartment with one hand while reaching under the front seat with the other." The officer interpreted the defendant's movement as threatening, and removed him from the car, frisked his person, and placed him in the police car. The officer then returned to the defendant's car and searched under the front seat and found a revolver. The Fifth Circuit analyzed the search under the Terry framework and found the officer's actions "manifestly reasonable" to protect his safety. Ullrich, 580 F.2d at 769–70. Similar to the Ullrich defendant, Jerry and Williams made reaching motions that, under the circumstances, Det. Wooten reasonably interpreted as reaching for a weapon. See Tr.

The facts of this case are distinguishable from those of United States v. Hunt, 253 F.3d 227, 231 (5th Cir. 2001), in which the Fifth Circuit found that the officer lacked reasonable suspicion to open a car door during a traffic stop. In Hunt, the officer pulled over the defendant for speeding. The officer became suspicious when the defendant got out and met him at the rear of the stopped car. The officer walked to the driver's door of the car and opened it, ultimately recovering crack cocaine inside a plastic bag stuffed in the door handle.

The Fifth Circuit found that the totality of the facts did not give rise to reasonable suspicion because the officer testified that the defendant did not make any concerning

movements or show concerning demeanor. The officer further testified that he did not suspect the defendant had any drugs or weapons, was driving under the influence, or that there was anything "unusual about the situation." The Fifth Circuit held it was not reasonable for the officer to search the car based merely on the defendant meeting him at the rear of the stopped car.

### D. Seizure of the Marijuana

Det. Wooten obtained Jerry's bag of marijuana according to the doctrines of consent and plain view. Courts have recognized several exceptions to the warrant and probable cause requirements, including voluntary consent to search or seize. Voluntariness turns on the totality of the circumstances, including:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

United States v. Tompkins, 130 F.3d 117, 121–22 (5th Cir. 1997). All six factors are relevant, but no single factor is dispositive on the issue.

Here, when Det. Wooten opened Jerry's car door, which he was permitted to do under the circumstances, he "immediately noticed [a] plastic baggie hanging out of [Jerry's] right pant leg." Tr. 60, 64. Det. Wooten noted that a "good bit of the bag" was "hanging out of Jerry's pocket." Tr. 63. Det. Wooten further testified that he "asked [Jerry] if he minded handing me the bag so I could see what was in it." Tr. 64. Det. Wooten recalled phrasing this question according to his common practice in such scenarios, which is the question "Do you mind handing me what's in your pocket." Tr. 64. Jerry then

grabbed the bag and handed it to Det. Wooten nervously. Det. Wooten observed the bag contained apparent marijuana.

The undersigned finds that Jerry's act of handing the baggie to Det. Wooten was voluntary consent for the seizure. Jerry was being detained at that time during a traffic stop while sitting in Williams' car, was not in official police custody, and was neither handcuffed nor in a police station. Jerry, as a convicted felon, had experience in the criminal justice system and reasonably would have had knowledge that the marijuana could have been used against him, and that he had a right to refuse to submit to police searches or seizures. Tompkins, 130 F.3d at 121–22. Furthermore, Det. Wooten testified that he asked for the bag in permissive language—whether Jerry "minded handing [the officer] the bag"—which is different from a command or order.

The seizure of the bag was also justified under the plain view doctrine, which permits an officer to conduct a warrantless seizure if the officer is lawfully positioned in an area from which he views the item, the item is in plain view, the incriminating nature of the item is immediately apparent, and the officer has a lawful right of access to the item. Horton v. California, 496 U.S. 128, 136–37 (1990). The incriminating nature of an item is immediately apparent when the officer has probable cause to associate the item with criminal activity. United States v. Buchanan, 70 F.3d 818, 826 (5th Cir. 1995) (noting the importance of an officer's training and experience and knowledge of the situation at hand in determining probable cause).

Det. Wooten was in a lawful place due to opening the car door pursuant to reasonable cause to believe weapons were concealed in the car. When Det. Wooten opened

Jerry's door, he "immediately noticed [a] plastic baggie hanging out of [Jerry's] right pant leg." Tr. 60, 64. Det. Wooten noted that a "good bit of the bag" was "hanging out of Jerry's pocket." Tr. 63. Det. Wooten observed that the bag was "open . . . but it looked like it had been pulled on and messed with a little bit for the reason that it was sticking out almost like someone tried to pull it out to hide it but didn't have enough time." Tr. 64. Based on his training and experience in narcotics investigations, Det. Wooten believed the type of bag to be indicative of those commonly used to store narcotics. Therefore, Det. Wooten's seizure of Jerry's bag of marijuana was independently justified under the doctrine of plain view.

### E. Search of the Car

#### 1. Introduction

Warrantless searches are generally unreasonable under the Fourth Amendment because they lack the oversight and authorization of a detached, neutral magistrate. Arizona v. Gant, 556 U.S. 332, 338 (2009). Courts have recognized several exceptions to this rule when probable cause otherwise exists and practicality necessitates expediency, including in the contexts of automobile and arrest searches. United States v. Ross, 456 U.S. 798 (1982).

#### 2. Automobile Exception

The automobile exception permits police to search "every part of the vehicle and its contents that may conceal the object of the search" when there is probable cause that the entire car contains contraband, including the trunk and all containers. Ross, 456 U.S. at 825. On the other hand, the search incident to a lawful arrest exception "derives from

interests in officer safety and evidence preservation that are typically implicated in arrest situations." Gant, 556 U.S. at 338.  Therefore, the exception permits police to search only the passenger area of an automobile incident to a recent occupant's arrest if it is reasonable to believe the vehicle contains evidence of the offense of arrest. Id.

Here, the officers had previously observed the defendants engaging in late-night, erratic driving in a high-crime area, and making very furtive reaching movements under their seats.  Prior to the search of the car, Det. Wooten recovered marijuana from Jerry's pocket.  Jerry attempted to flee the scene on foot, and Det. Wooten found a loaded Glock magazine in his pocket.  Jerry's flight, together with the recovered marijuana and the loaded Glock magazine, gave rise to an inference of guilty knowledge that the car contained additional contraband.  United States v. Fiesco, 21 F.3d 1108 (5th Cir. 1994).  At that point in the stop and considering the totality of the circumstances, the officers had probable cause to believe that additional narcotics or other contraband were concealed in the car.

### 3. Search Incident to Arrest

Under the search incident to a lawful arrest exception, the officers were initially only permitted to search the passenger area (occupied by Jerry) of Williams' car.  Gant, 556 U.S. at 351.  However, after they found the Glock pistol under Jerry's seat, they had probable cause (a) to arrest both Williams and Jerry based on joint possession and their convicted felon statuses (which would have been obtained from dispatch before Defendants were released); and (b) to search the entire car for additional weapons and contraband.

### 4. Inventory Search and Inevitable Discovery

The officers testified that Williams' car would have been inventory searched as a matter of course prior to its release to his family member to ensure that evidence did not get removed or destroyed and to make sure the family member does not get pulled over and arrested for something they did not know was in the car. Tr. at 68, 72. The Government contends that the officers were thereby justified in searching Williams' car's trunk under the inevitable discovery doctrine. United States v. Seals, 987 F.2d 1102, 1108 (5th Cir. 1993). The court need not reach this argument given the other justifications set forth above for the search of the car.

Accordingly,

It is recommended that Defendants' Motions to Suppress (Docs. 19 & 31) be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and

legal conclusions accepted by the district court. See <u>Douglass v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

    THUS DONE AND SIGNED at Shreveport, Louisiana, this 18th day of June, 2019.

*/s/ Mark L. Hornsby*
Mark L. Hornsby
U.S. Magistrate Judge